Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

# UNITED STATES DISTRICT COURT

for the

Eastern _____ District of Pennsylvania

_____ Division

|  |  |
|---|---|
| Ra'Sheen J. Brown, Sr<br>_Plaintiff(s)_<br>(Write the full name of each plaintiff who is filing this complaint.<br>If the names of all the plaintiffs cannot fit in the space above,<br>please write "see attached" in the space and attach an additional<br>page with the full list of names.)<br><br>-v-<br><br><br>See Attached<br>_Defendant(s)_<br>(Write the full name of each defendant who is being sued. If the<br>names of all the defendants cannot fit in the space above, please<br>write "see attached" in the space and attach an additional page<br>with the full list of names. Do not include addresses here.) | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. _____<br>_(to be filled in by the Clerk's Office)_<br><br>Jury Trial: _(check one)_  ☒Yes  ☐No |

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

(Non-Prisoner Complaint)

---

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

---

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non-Prisoner)

I.    **The Parties to This Complaint**

A.    **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

Name        Ra'Sheen J. Brown, Sr.
Address      614 S. 8th Street, # 330
             Philadelphia          PA          19147
                  City            State        Zip Code
County       Philadelphia
Telephone Number    267.981.8737
E-Mail Address      rjbrownsr20@gmail.com

B.    **The Defendant(s)**

Provide the information below for each defendant named in the complaint; whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1

Name                  See Attached
Job or Title *(if known)*
Address               1515 Arch Street, 14th Floor
                          City            State         Zip Code
County
Telephone Number
E-Mail Address *(if known)*

☐ Individual capacity    ☐ Official capacity

Defendant No. 2

Name                  See Attached
Job or Title *(if known)*
Address               1515 Arch Street, 14th Floor
                      Philadelphia          PA          19102
                          City            State         Zip Code
County
Telephone Number
E-Mail Address *(if known)*

☒ Individual capacity    ☒ Official capacity

Page 2 of 6

Defendant No. 3

Name — See Attached

Job or Title (if known)

Address — 1515 Arch Street, 14th Floor
Philadelphia      PA      19102
       City        State        Zip Code

County

Telephone Number

E-Mail Address (if known)

☒ Individual capacity     ☒ Official capacity

Defendant No. 4

Name — See Attached

Job or Title (if known)

Address — 1515 Arch Street, 14th Floor
Philadelphia      PA      19102
       City        State        Zip Code

County

Telephone Number

E-Mail Address (if known)

☒ Individual capacity     ☒ Official capacity

II.    **Basis for Jurisdiction**

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.    Are you bringing suit against (check all that apply):

     ☐ Federal officials (a *Bivens* claim)

     ☒ State or local officials (a § 1983 claim)

B.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

See Attached

C.    Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

N|a

D.   Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

See Attached

## III.   Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.   Where did the events giving rise to your claim(s) occur?

See Attached

B.   What date and approximate time did the events giving rise to your claim(s) occur?

See Attached

C.   What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

See Attached

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non-Prisoner)

IV.    Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

See Attached

V.    Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims.

$ 10,000,000.00 ; See Attached

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non-Prisoner)

## VI.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.      For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:   May 13th 2025

Signature of Plaintiff

Printed Name of Plaintiff   Ra'Sheed J. Brown, Sr.

### B.      For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Address

| City | State | Zip Code |
|------|-------|----------|

Telephone Number

E-mail Address

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

RA'SHEEN J. BROWN,
      Plaintiff

           V.

CITY OF PHILADELPHIA,
DETECTIVE RONALD DOVE,
DETECTIVE JAMES PITTS,
DETECTIVE JOHN KEEN,
DETECTIVE JOHN HARKINS,
DETECTIVE GEORGE PIRRONE, and
CHRISTOPHER TANKLEWICZ
 Individually and as police officers for the
City of Philadelphia,
      Defendants

Civil Action No. 18-
JURY TRIAL DEMANDED

COMPLAINT
1. PRELIMINARY STATEMENT

1.     In 2013, Plaintiff Ra'Sheen J. Brown was convicted and sentenced to life in prison. Ten years later, the trial court acting under the Post Conviction Relief Act vacated the conviction, finding that constitutional violations by the prosecution had undermined the fairness of the plaintiff's trial and the validity of the jury's verdict. Plaintiff brings this action under 42 U.S.C. §1983 seeking redress for the extraordinary misconduct of Defendants Ronald Dove ("Dove"), James Pitts ("Pitts"), John Keen ("Keen"), John Harkins ("Harkins"), George Pirrone ("Pirrone") and Christopher Tankelewicz ("Tankelewicz") who coerced witnesses, fabricated evidence, engaged in deliberate deception by concealing and/or suppressing material evidence, employed unlawful investigative techniques, presented false testimony, and, together with other Philadelphia police officers, denied the plaintiff due process of law and a fair trial. The actions and conduct of the defendant officers were the results of policies, practices, customs, and deliberate indifference on the part of Defendant City of Philadelphia, including the failure to

properly train and supervise officers assigned to investigate homicides, and the failure to take disciplinary and remedial action against the defendant detectives and other police officers who commit serious misconduct and abuses of authority.

## 11. JURISDICTION

2.    This action is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is founded upon 28 U.S.C. §§1331 and 1343(1), (3), (4) and the aforementioned statutory provision. Plaintiff further invoke the supplemental jurisdiction of this Court under 28 U.S.C. § 1367(a) to adjudicate state law claims.

## 111. PARTIES

3.    Plaintiff Ra'Sheen J. Brown is a resident of Philadelphia, Pennsylvania and at all times relevant to this action was in the Eastern District of Pennsylvania.

4.    Defendant City of Philadelphia is a municipality of the Commonwealth of Pennsylvania and owns, operates, manages, directs and controls the Philadelphia Police Department which at all times relevant to this action employed Defendants Dove, Pitts, Keen, Harkins, Pirrone and Tankelewicz.

5.    Defendants Dove, Pitts, Keen, Harkins, Pirrone and Tanklewicz ("the defendant officers") were at all times relevant to this action police officers or detectives for the Philadelphia Police Department acting under color of state law. The defendant officers are being sued in their individual capacities.

6.    At all relevant times, all defendants were acting in concert and conspiracy, and their actions deprived the plaintiff of his constitutional and statutory rights.

7.    At all times relevant to this Complaint, all defendants acted under color of state law.

## IV. FACTUAL ALLEGATIONS

The Murder

2

8.    On October 17, 2011, Akkier McKinney ("McKinney"), who was a patron at El Ran's Bar in the Frankford section of Philadelphia, got into a verbal altercation with an individual later identified as Rasheed Ingram ("Ingram"). The argument stemmed from them bumping into one another at the entrance of the bar.

9.    As the argument escalated it eventually made its way outside with McKinney and Ingram exchanging threats back and forth.

10.    The bartender, William Fowler ("Fowler"), came outside to de-escalate the situation.

11.    McKinney and Ingram continued to argue with McKinney walking back and forth to the trunk of his car and asking Ingram if he had a problem, if he was cool, straight.

12.    Ingram ignored McKinney and kept arguing with him while standing in the street.

13.    McKinney and Ingram continued arguing and as McKinney got into his car gunshots erupted.

14.    The first 911 call came in at 11:15 p.m. By 11:20 p.m. and 11:25 p.m., respectively, police and medical personnel had arrived on the scene. McKinney, who was still in the driver's seat, was found suffering from gunshot wounds to the head, abdomen, and thigh. EMTs rushed McKinney to a nearby hospital. At 12:05 a.m., doctors pronounced him deceased.

The Eyewitnesses

15.    Upon arriving police personnel from Septa and the Northeast detective division spoke to Fowler who couldn't even recall being present when the shooting happened. His exact words were, "I heard arguing and then gunshots."

16.    In addition to Fowler police encountered Lalana Brown ("Ms. Brown"), no relation to Plaintiff, who they determined witnessed events leading up to the shooting based off their examination of video surveillance provided by the bar owner Elizer Torres who had arrived within minute of the first responding officers.

The Police Investigation

17.    A squad of detectives known as 3 platoon was assigned to the McKinney case, led by defendant Pirrone.

3

18. Pirrone arrived and took over the investigation from responding police personnel and had both witnesses transported to homicide against their will where they were subject to hours of interrogations.

19. Defendant Pirrone directly participated in the activities at the crime scene on the day of the murder and, in concert with other personnel determined what was photographed, measured, and collected. Specifically, he directed the collection of ballistic evidence which consisted of five fired cartridge casings that were on the driver's side within three to five feet of McKinney's car and projectiles that were located on the opposite side of the vehicle.

20. Defendant Pirrone viewed the video surveillance with the bar owner who assisted him and sent both portions of it and stills back to homicide.

21. This was documented in his "activity sheet."

22. Back at the station defendants Dove and Pitts questioned and took statements from Ms. Brown and Fowler.

23. Ms. Brown was extremely intoxicated and could not remember anything until she was told and shown video/stills of the incident by Dove.

24. What she did remember however was that she did not want to be there or cooperate with the defendant but was not allowed to leave until she made identifications and signed a statement.

25. Fowler, who was also extremely inebriated, was subject to extreme levels of physical and psychological coercion at the hands of Pitts. Not only were articles of his clothing removed. He was threatened with being charged with the murder of Mckinney, slapped, punched, gripped up, locked in a room, handcuffed to a chair, made to urinate in a paper cup with a hole in it, stick his finger in that hole, walk around barefoot and told not to spill a drop or he'd be fucked up more.

26. After hours of being shown video/stills of the incident during a uniquely suggestible state (i.e., intoxication), the defendant officers conducted subsequent identifications procedures that corrupted the witnesses' memories and improperly secured tainted identification evidence that was used against plaintiff at trial.

27. Although the witnesses' preliminary information differed in detail, it was consistent in critical aspects. Both stated that an argument had broken out between McKinney

4

and Ingram; that plaintiff was present in the bar; that the argument eventually went outside; that the two men (McKinney and Ingram) continued to argue; and that plaintiff was across the street with other individuals at the time of the shooting.

28.    The witnesses stated repeatedly that they did not see either the shooting or the shooter.

29.    They were questioned for hours without their statements being documented per department policy not to memorialize anything until the witness "told the truth."

30.    Two statements were produced, however. Those were the final products. "The truth" as required by the previously mentioned policy.

31.    Ms. Brown's came eleven (11) hours after being brought into custody and Fowler's thirteen (13) hours after being brought in.

32.    The statements mirrored what the witnesses said earlier but included significant differences, plaintiff was now directly involved in the argument and identified by Fowler as being responsible for the shooting.

33.    As an aside, an interesting fact is the way the plaintiff is alleged to have been identified by Fowler. Fowler did not know the plaintiff. He knew the plaintiff's brother Darryl Boggs ("Boggs").

34.    Fowler's statement identifies the plaintiff as the brother of Boggs who the statement goes on to say was locked up for shooting someone else at the same bar months earlier. This is significant because as pointed out below defendant Pitts stated that Fowler identified Boggs as being in the bar on the night of the murder.

35.    Despite the above absurdity and obvious inconsistencies between the location of the fired cartridge casings and the plaintiff's location in the statements (the statement state that plaintiff was across the street at the time of the shooting), and despite the apparent unreliability of the coerced statements, the defendant officers zeroed in on the plaintiff as their guy.

The Arrest

36.    Plaintiff was picked up for the murder on October 21, 2011, at approximately 9:15 a.m., at C.J.C. while there on unrelated matters.

37.    When asked about the crime, the plaintiff waived his right to counsel and voluntarily gave a statement denying any involvement or participation in the murder, said that at

that time of the crime he was across the street talking to an individual named Allen Jackson ("Jackson"), known as "Skeet" and "Ski", and on his phone.

38. He spoke with defendant Pirrone and willingly supplied Pirrone with the names and numbers of other individuals who were at the bar and signed a statement denying the accusation but admitting his presence at the scene.

39. Despite that information defendant Pirrone never sought out Jackson to confirm or disprove the plaintiff's alibi, instead he pursued the plaintiff who he perceived as his guy.

40. During the detention of the plaintiff defendant Pirrone submitted a charging packet to Assistant District Attorney Edward Camaron who decline to charge plaintiff and asked for additional evidence and suggested that it be video or audiotaped.

41. Not having enough evidence defendant Pirrone resorted to questioning plaintiff again and turned plaintiff's cell phone on to monitor incoming calls. Christopher Graham ("Graham"), who was brought up in Fowler's interview, and who's number was provided by the plaintiff, kept calling and defendant Pirrone insinuated that if the plaintiff did not incriminate himself defendant Pirrone would have Graham picked up and he'd do it.

42. Twenty-eight (28) hours after being brought in, Graham was picked up and brought into homicide on a fake warrant.

43. Defendants Harkins interviewed and took statements from Graham at the police station.

44. Graham's first statement was that he did not know the plaintiff.

45. This conversation was also noted in their "activity sheets."

The Calls

46. Not satisfied, defendant Harkins placed two phone calls to the plaintiff's cell phone from Graham's while both he and the plaintiff were in police custody to compel Graham to cooperate and incriminate the plaintiff.

47. Graham, however, gave other information thought to be false by the defendant so he did not memorialize it per policy and instead continued questioning him.

48. This too was documented in the "activity sheet."

49. Graham held out and was subject to acts of physical and psychological coercion like the removal of articles of his clothing, threats of prosecution, and prolonged detention.

6

50.    Fifteen (15) hours after being brought in he signed a statement implicating the plaintiff in the murder.

51.    The statement indicated that Graham, the plaintiff, and another individual identified as Shawn Manning ("Manning") were outside of his house the following day wherein when asked what happened with the old head (i.e., McKinney) plaintiff was supposed to have stated "He's done, it's over, finito." Those words were documented as an admission of guilt.

The Formal Arraignment

52.    After securing the final piece of incriminating evidence, plaintiff was formally charged and thereafter, approximately fifty-six (56) hours after being brought in at 5:46 p.m. on the 23rd, arraigned for the murder of McKinney.

53.    But that didn't conclude the investigation. Graham was rearrested and brought in two days later on the 25th of October and provided additional statements.

54.    Graham explained that he had not been with the plaintiff the following day as documented in his previous statement and that the plaintiff did not confess to him. Conversely, he did not see, hear, or have knowledge of who committed the murder.

The Searches

55.    On the 27th Pirrone sought warrants for the cell phone records of the plaintiff and Graham.

56.    In the warrant for the plaintiff's cell phone records Pirrone deliberately misstated the evidence falsely claiming that when questioned the plaintiff had stated that he left prior to the incident. Apparently, this was to acquire cell site data which the warrant requested.

57.    In the warrant for Graham's records Pirrone falsely attributed the names and numbers provided by plaintiff to Graham claiming that he provided the names and numbers of his associates and that the records were needed to confirm the information provided.

58.    Both warrants were executed and the requested records documented as received.

59.    The defendants' disregard of Constitutional rights and of generally accepted police practices, including the use of threats, prolonged detention, and violence improperly influenced the witnesses to identify the plaintiff as the man who murdered McKinney - whether that evidence was ultimately true or not – and this coercion tainted the fairness of the resulting proceedings.

7

The Preliminary Hearing

60.    On February 28th, 2012, a preliminary hearing was held before the Honorable David C. Shuter.

61.    Despite the failure to make any positive identification immediately following the crime, Fowler ultimately becomes the only testifying eyewitness at the preliminary hearing.

62.    Fowler testified about his experience with defendant Pitts. About how he was threatened with being charged with the murder of Mckinney, how he was slapped, punched, gripped up, locked in a room, and handcuffed to a chair.

63.    He stated that Pitts would not let him leave until he agreed with his (i.e., Pitts') narrative and signed the statement.

64.    Due to Pennsylvania's rule on the use of out-of-court statements, the case was bound over for trial.

Pretrial Proceedings And Discovery

65.    After the preliminary hearing was conducted the Commonwealth provided what was called discovery.

66.    Included in the discovery packet provided by the Commonwealth were, inter alia, activity sheets, search warrants, and the seized records for the plaintiff cell phone records.

67.    Nowhere in discovery was any statement or mention of the plaintiff's cooperation with detectives during the period of his detention prior to being charged by defendants.

68.    The activity sheet didn't even acknowledge that he was arrested on the 21st of October.

69.    The activity sheet documented statements made by Graham during his detention but the actual statements he made were not turned over to the Commonwealth by the defendant officers.

70.    The search warrant indicated that Graham's cell phone records were obtained but likewise they were not turned over to the prosecution.

The Suppression Hearings

71.    Plaintiff sought to suppress several items before trial. He challenged his cell phone records due to false information in the search warrant, Graham's out-of-court statement linked to the improper phone calls, and Fowler's pretrial identification as overly suggestive.

8

72.     The Commonwealth called defendant Pirrone to refute any allegations of impropriety.

73.     Pirrone testified that he did not speak to the plaintiff during his detention at the roundhouse and therefore the statement in the warrant indicating that "he had stated he left prior to the shooting" was referring to something Graham had said.

74.     Initially, defendant Pirrone claimed he was off duty and had no contact with Graham either. But when confronted with evidence showing that Graham was spoken to on the 22nd, he changed his story, despite no reference anywhere else to his interviewing Graham, he falsely added corroborating, yet unsupported details to his unsupported pretrial testimony, stating that he spoke to Graham and the calls were accidentally made while Graham was providing him names and numbers of his associates.

75.     Defendant Pirrone also falsely testified, unchallenged by the evidence itself, that Graham's cell phone records were not turned over by the cell phone provider.

76.     With no knowledge of documentation that the records were received, other than a notation on the warrant, trial counsel had no basis to show defendant Pirrone's deliberate falsification.

77.     Defendant Pitts testified at the suppression hearing to the identification procedures used during his questioning of Fowler. He stated that although Fowler didn't initially identify the plaintiff as being the shooter he was shown images on a "photo imager" and asked to pick out anybody that he saw at the bar that night. Among those photos was a picture of Boggs, the plaintiff's brother, who, as was later documented, was incarcerated at the time McKinney was killed.

78.     Pitts claimed everything was done by the books and that the plaintiff's subsequent identification as the shooter by Fowler was the product of Fowler eventually determining himself to cooperate fully with detectives.

79.     All motions were denied, and the case went forward to a trial on the merits.

80.     The defendant officers deliberately deceived counsel and the court; their disregard of Constitutional rights tainted the fairness of those proceedings.

The Trial

9

81.    Plaintiff's jury trial began on June 18th, 2013, in front of the Honorable Glenn B. Bronson. All three civilian witnesses disavowed their out-of-court statements.

82.    The Commonwealth called Ms. Brown to testify that she saw plaintiff involved in the dispute with the victim before the murder. Neither trial counsel nor, presumably, the Commonwealth had been told that the defendant officers had used coercion to force Ms. Brown to implicate plaintiff.

83.    Ms. Brown testified on both direct and cross-examination that she was transported to homicide against her will and pressured to speak to defendant Dove. She stated she did not want to speak with Dove. She stated unequivocally that during the eleven (11) hours she was questioned, she was under the influence of alcohol and had little to no independent memory of the events.

84.    The Commonwealth likewise called Fowler to testify that he saw plaintiff shoot McKinney. This time both the prosecutor and trial counsel had knowledge that the defendant officers had used coercion, threats, and violence to force Fowler to implicate plaintiff.

85.    Fowler testified that he was transported to homicide against his will.

86.    He went into even greater detail about his ordeal with Pitts and the brutality that he faced while still maintaining that he was not allowed to eat or drink during his questioning, that in an effort to compel him to say what he (i.e., Pitts) wanted to hear Pitts slapped, punched, gripped him up, handcuffed him to a chair,  locked him in a room, removed articles of his clothing, made him walk around barefoot, urinate in a paper cup with a hole in it, place his finger in the hole, carry the cup and told not to spill a drop or he'll get fucked up more.

87.    Fowler testified that the only reason he signed the statement was because he feared further violence. According to him, he felt that he could not leave until he told Pitts what Pitts wanted to hear and implicated Mr. Brown because of Pitts' insistence.

88.    Fowler's account was so graphic that the defense counsel choose not to cross-examine him at all because he told the defenses story.

61.    Like Ms. Brown and Fowler, The Commonwealth called Graham to testify to his supposed conversation with Mr. Brown the day after the murder. Neither trial counsel nor, presumably, the prosecutor had been told that the defendant officers had used coercion and

threats to force Graham to implicate plaintiff, leaving no means to challenge his testimony other than standard cross-examination.

89. Graham testified that he was brought in against his will. He testified to his being under the influence of alcohol when he was apprehended and subject to pressure and was not allowed to leave until he cooperated with detectives.

90. Graham stated that he did not provide the names and numbers associated with him and that detectives used his cell phone to call plaintiff's while he was in custody.

91. Overall, Graham did not make an ideal witness for either the Commonwealth or defense due to his intellectual disabilities. It was established that Graham could barely read or write and shown that he was functionally, for lack of a better word, retarded.

92. Ms. Brown, Fowler, and Graham's statements were introduced through detectives.

93. Defendant Dove denied that Ms. Brown was intoxicated and falsely claimed that she was one of the most cooperative witnesses he had ever dealt with in his entire career.

94. There was extensive debate about the video surveillance, still photographs, and the order that they were shown to the witness.

95. Dove falsely claimed that the video was unavailable until right before the formal statement was taken.

96. It was established that Dove was the only detective to interact with Ms. Brown during her entire eleven (11) hours at homicide.

97. Defendant Harkins testified that there was no coercion employed against Graham and falsely claimed that the words documented were Graham's verbatim.

98. During Harkins' testimony a key fact was brought out for the first time and that was that the names of the other individuals identified in the investigation were known prior to speaking to Graham. It was not stated, however, how they were learned.

99. The Commonwealth called Tanklewicz as its forensic expert to point out his forensic extraction of data from plaintiff's phone. The extraction was done pursuant to a warrant that was not previously turned over in discovery but was based on the same false statements. Among the data where names and number of associates know to plaintiff.

100. Although Graham's cell phone records were not turned over this was used to show that plaintiff and Graham knew the same people.

11

101. Tanklewicz also attempted to corroborate the allegation in Graham's out-of-court statement that he called plaintiff after the murder but did not get through. To that end, Tanklewicz produced a fabricated cell phone record showing a missed called at the time of the shooting.

102. Pitts claimed that no violence, physical or psychological was employed against Fowler. He largely testified consistently with his suppression hearing testimony, falsely claiming that although Fowler didn't initially identify plaintiff, he eventually identified plaintiff on his own accord. Additionally, like during the testimony of defendant Dove, there was extensive debate about the order that Fowler was shown the video surveillance and still photographs.

103. Pitts falsely claimed that the video surveillance was not available until right before the formal statement was taken.

104. Due to the perceived weaknesses in his credibility the Commonwealth sought to rehabilitate his testimony by calling his partner defendant Keen.

105. Defendant Keen falsely testified that he was at homicide while conducting other task and saw Pitts and Fowler via monitor multiple times throughout the interview. He also falsely claimed that he was present during the taken of Fowlers statement.

106. Due to scheduling conflicts defendant Pirrone was not called as a witness during the trial so his activities in the investigation were detailed by his partner Gregory Santamala ("Santamala").

107. It was brought out through Santamala's testimony that the activity sheets showed that the video was accessed and turned over to defendant Pirrone the night of the murder by the bar owner. Further, the information in the warrants was brought out.

108. But the jury never had an opportunity to hear defendant Pirrone cross-examined on what he was able to do with the video (e.g., whether he took still photographs or sent back live video to detectives) and the issue of how those names and numbers were attributed to Graham.

109. Additionally, the jury never got to hear defendant Pirrone cross-examined on the alleged interview and questioning of Graham wherein Graham allegedly provided the other information in the warrants and why the warrant for Graham's records indicated that they were retrieved.

110. The case for the defense was limited.

111.    Trial counsel called Jackson; the alibi witness plaintiff named in his police statement. Jackson testified for the defense that he observed Ingram shoot and kill McKinney.

The Verdict And Sentencing

112.    With plaintiff's trial ultimately being a credibility contest between the witnesses and detectives with the prosecutor arguing that the detectives were sworn officers of the law with no reason to lie, the jury returned a verdict of guilty on first degree murder, conspiracy, carrying a weapon without a license, and possessing the instruments of a crime. Plaintiff was sentenced to the mandatory sentence of life in prison

Post-Trial Proceedings

113.    During the pendency of plaintiff's direct appeal several important developments took place. First it was reported that defendant Pitts had been found to have fabricated evidence in the cases of Nafis Pinkney, Unique Drayton, and Amin Speaks. Second, that defendant Dove was under investigation in the cover up of three homicides and a disappearance.

114.    Dove was formally dismissed by the Philadelphia Police Department on December 5th, 2013.

115.    Plaintiff initially challenged his conviction in the Superior Court of Pennsylvania, raising an after-discovered evidence claim and seeking a hearing based on the above discoveries. This appeal is docketed at 3047 EDA 2013.

116.    On January 22nd, 2015, defendant Dove was criminally charged with hindering apprehension, flight to avoid apprehension, two counts of conspiracy, obstructing the administration of law, tampering with or fabricating physical evidence, and unsworn falsification to authorities.

117.    On February 16th, 2015, the Superior Court affirmed the judgement of sentence.

118.    On July 26th, 2016, the Supreme Court of Pennsylvania denied plaintiff's petition for allowance of appeal. This is docketed at 93 EAL 2016.

119.    Plaintiff challenged his conviction collaterally via Post Conviction Relief Act ("PCRA") proceedings that were denied on May 28th, 2019. This is docketed at 1846 EDA 2018.

120.    Among the issues raised was plaintiff's discovering that on April 21st, 2016, following an eight (8) day jury trial defendants Pirrone and Pitts were found guilty of conspiring to deprive Kareem Alleyne of his freedom by making false statements, failing to correct false

13

statements, making material omissions, and failing to provide full and fair information to the District Attorney's Office ("DAO"), the Medical Examiner's Office, and other officers.

121. Plaintiff sought habeas reviewing on September 2nd, 2019, filing a petition for habeas corpus, in federal court after being denied PCRA relief.

122. While that petition was pending plaintiff filed a successive PCRA petition alleging, inter alia, that: "the prosecution failed to disclose exculpatory evidence in violation of Pa.R.Crim.Pro. 573 and Brady v. Maryland, 363 U.S. 83 (1963), in relation to Graham who provided the plaintiff with an affidavit asserting that he made multiple statements that were never turned over to the defense.

123. The Commonwealth then turned over copies of investigation materials (i.e., homicide files) that were concealed by the defendant officers and not provided to the plaintiff's criminal defense trial counsel. Accordingly, plaintiff would not learn that there was documentation of him speaking to detectives and providing the names and numbers, falsely attributed to Graham, in the McKinney investigation until a decade after his trial, when he received the information as part of PCRA discovery.

124. On February 28, 2022, defendant Pitts was criminally charged with two (2) counts of perjury – for lying under oath on March 22nd, 2013, and March 29th, 2012; and three (3) counts of obstructing the administration of law or other government function – for physically assaulting a person during an interview.

125. An evidentiary hearing was held on the petition and while awaiting a response the prosecution turned over three hundred (300) pages of disclosure material of defendant Pitts.

126. Plaintiff immediately asserted Brady violations based on three (3) sustained findings of misconduct contained in the disclosure material.

127. One of the sustained findings dealt with both defendants Dove and Pitts.

128. The misconducts were initially detailed in a joint stipulation of fact filed by the Commonwealth and defense in the unrelated case of Commonwealth v. Onyiah, No. CP-51-CR-0001632-2011.

129. On March 29th, 2023, the Commonwealth conceded that the plaintiff should be awarded a new trial as his constitutional rights were violated by the Commonwealth's failure to abide by the mandates of Brady.

130. After being awarded a new trial, the plaintiff remained in custody for two more years pending a trial that the Commonwealth signaled that it intended to pursue. Although Fowler had long since past the prosecution indicated that it would seek to introduce his statement through defendant Keen even though he had no part in taking Fowler's statement. Faced with two options: face another credibility contest between civilians and law enforcement or enter a *nolo contendere* plea to a reduced charge for a prison sentence of less time than he had already served. Plaintiff chose the latter.

131. On March 25, 2025, the plaintiff entered a "no contest" plea to Third Degree Murder and was sentenced to 3 $\frac{1}{2}$ to 7 years, time served. Plaintiff served 14 years in prison based on evidence that was procured by coercion – whether he committed the offense or not.

132. The actions and conduct of the individual defendants, as described above, violated the plaintiff's Fourteenth Amendment right to due process of law and a fair trial.

133. The fabrication of and tampering with evidence by the defendant officers — including a) powering on plaintiff's cell phone and using Graham's to call it in order to confront Graham, b) extracting information out of plaintiff's cell phone and attributing it to Graham, b) falsifying search warrants,  c) coercing the testimony of Brown, Fowler, and Graham , and d) fabricating a call between Graham's cell phone and plaintiff's to corroborate the statement that he called plaintiff— violated the plaintiff's right to due process of law and a fair trial.

134. The defendant officers were deliberately deceptive by concealing and/or suppressing critical evidence — including a) homicide files that showed plaintiff cooperated, spoke to, and provided statements to Pirrone; b) homicide files that showed that the names and numbers of the other individuals were provided by Plaintiff and c) homicide files that contained information showing that Graham's cell phone records were turned over by the cell phone provider — and thus violated the plaintiffs right to due process of law and a fair trial.

135. The defendant officers' use of threats and coercion directed at witnesses, including but not limited to Brown, Fowler, and Graham for the purpose of eliciting evidence implicating Mr. Brown in the murder, violated the plaintiff's right to due process of law and a fair trial.

136. Defendants' failure to conduct a reasonably thorough investigation that considered evidence negating the existence of grounds to prosecute plaintiff, including the testimony and evidence referenced above, denied the plaintiff a fair trial.

137. The concealment and/or failure to disclose the relevant and material evidence described above violated the plaintiffs right to due process of law and a fair trial.

138. Defendants failed to advise the District Attorney's Office and criminal defense counsel of material evidence that negated the existence of probable cause to initiate the prosecution of plaintiff and provided false, misleading and incomplete information to the District Attorney's Office that resulted in the initiation of a murder prosecution for the death of McKinney.

139. As a result of the actions and inactions of the defendant officers, Ra'Sheen Brown was compelled to stand trial in a murder case, causing him substantial harm.

The PPD's pattern and practice of unconstitutional misconduct in homicide investigations, including the fabrication of evidence, coercion and threats to secure false statements from witnesses and suspects, failure to conduct proper investigations, and suppression of exculpatory evidence

140. For many years dating back at least to the 1970's, and continuing well beyond the time of the investigation of Mr. McKinney's murder, the City of Philadelphia, had in force and effect a policy, practice, or custom of unconstitutional misconduct in homicide investigations, and in particular, using coercive techniques in interviews and interrogations to obtain incriminating evidence from witnesses, suspects, and arrestees; fabricating inculpatory evidence; conducting improper identification procedures; concealing or withholding exculpatory evidence; tampering with or manufacturing evidence; and fabricating incriminating statements from witnesses, suspects, and arrestees.

141. This policy, practice, or custom involved the use of various techniques to coerce incriminating statements, including without limitation: isolation; separating juvenile or otherwise vulnerable suspects or witnesses from friends and family; subjecting individuals to needlessly prolonged interrogations; making false promises, including the promise that a suspect or witness will be allowed to go home if he or she makes an inculpatory statement and/or be given favorable treatment; the use or threat of physical violence; authoritative assertions of a suspect's guilt, including without limitation confrontation with false inculpatory evidence; and providing

16

false assurances—including to juveniles and other vulnerable people—that the suspect or witness will benefit from making an inculpatory statement that minimizes the suspect's own involvement.

142.    These practices were well known to the City of Philadelphia and its policymakers with respect to criminal investigations and prosecutions as a result of newspaper investigations including Pulitzer Prize winning reporting in the Philadelphia Inquirer, Daily News, and other sources going back to 1977, governmental investigations, complaints from lawyers and civilians, and internal police investigations.

143.    Various cases demonstrate that this misconduct was pervasive within the Philadelphia Police Department at time of plaintiff's 2013 trial, and, upon information and belief, the misconduct described below was committed with the knowledge of Homicide unit and PPD supervisors or because of their deliberate indifference to this misconduct.

a.    **Dwayne Thorpe** (CP-51-CR-00011433-2008). Mr. Thorpe had been convicted of murder based on misconduct by defendant Pitts that included coercive witness interrogation and numerous other actions that denied Mr. Thorpe a fair trial. After spending nearly ten years in prison, Mr. Thorpe was exonerated.

b.    **Obina Onyiah** (CP-51-CR-0001632-2011). During the robbery of a jewelry store the proprietor in that case and one of the co-conspirators were shot and killed. The incident was caught on video surveillance. Despite promising leads Onyiah, who was over 5 inches taller than the person in the video, was suspected based on the uncorroborated identification of a jailhouse informant. Detective Pitts interrogated Onyiah and extracted a statement from him implicating himself. Mr. Onyiah, and several witnesses, described Det. Pitts hitting Onyiah repeatedly until he cooperated. Later it was proved, scientifically, that Mr. Onyiah could not be the person in the video.

c.    **Derrill Cunningham** (CP-51-CR-0012941-2011). During Cunningham's April 2014 murder trial Det. Pitts assaulted a witness in the hallway after she testified to allegations of abuse by him.

d.    **India Spellman** (CP-51-CR-0001160/61-2011). Ms. Spellman's convicted stemmed from the august 18, 2010 robbery of Shirley Philips and the subsequent robbery and shooting death of George Greaves. Det. Pitts employed highly coercive interrogation tactics resulting in her and a fourteen-year-old boy signing fabricated statements that implicated them both in a robbery and murder. "After multiple hearings a judge finally granted Ms. Spellman the relief, she is due and granted the DAO's motion to exonerate her completely. Ms. Spellman currently has a lawsuit pending against Det. Pitts.

e.    **Christopher Goodwin** (No. 18-cv-5269). Two prosecution witnesses recanted at Goodwin's trial alleging that their prior written statements inculpating Goodwin had been

17

coerced by Detective Pitts who did not testify at trial and was not among the detectives who took the witnesses' formal statements. Specifically, Andre Cunningham who provided the statement to detective John Verrecchio, the assigned detective, and detective Thomas Gaul, alleged that detective Pitts threatened and choked Cunningham. Agreeing with the Commonwealth, the Magistrate Judge found the Brady violations based on the non-disclosure before trial of IAD sustained findings of misconduct by detective Pitts.

f.   **Kareem Alleyne** (No. 1648 C.D. 2016). The arrest that set this civil action in motion followed the death of Officer Marc Brady (Officer Brady). Officer Brady died from injuries he sustained on July 15, 2012, because of being hit while riding a bicycle by a vehicle driven by Alleyne. Officer Brady and Alleyne had a history of personal conflict. Following the incident, the Philadelphia District Attorney's Office charged Alleyne with Homicide by Vehicle and Involuntary Manslaughter based on misstatements of fact and deliberate lies told to Assistant District Attorney Jennifer Selber by Detectives Pitts and Pirrone to persuade her to file criminal charges. At the trial, Mr. Alleyne was acquitted of all charges. In the civil suit for malicious prosecution a jury awarded him 1.2 million dollars compensation for his wrongful arrest and prosecution.

g.   **I. Dean Fulton** (CP-51-CR-0431331-1988). Mr. Fulton was arrested and subsequently convicted of murder based on evidence illegally obtained by Det. Harkins. The Supreme Court of Pennsylvania's review of the record in Mr. Fulton's case revealed that Detective Harkins conducted three distinct searches of Fulton's cell phone without a warrant. The first occurred when the detective powered on the phone. Detective Harkins engaged in a second warrantless search when he obtained the phone's assigned number. After powering on the phone, Detective Harkins navigated through the menus of the flip phone to obtain its number. Detective Harkins conducted a third warrantless search of the phone when he monitored incoming calls and text messages. To aid in his investigation of the murder, he kept the phone powered on, monitoring the calls and text messages that came through by viewing the number and/or assigned name of the individual calling or texting on the flip phone's internal or external display. Because all the evidence was acquired as result Mr. Fulton's conviction had to be vacated.

h.   **Jerome Loach** (CP-51-CR-0006738-2010). Jerome Loach was convicted of criminal conspiracy stemming from an armed home invasion committed by two other individuals and sentenced to 25 to 50 years imprisonment. After he was convicted Loach obtained information showing that the prosecution misrepresented cell phone evidence that was used to connect Loach to his Coconspirators. Loach went to trial in 2011 and ADA Joseph McCool prosecuted the case. ADA McCool relied on cell phone records and testimony from detective Christopher Tankelewicz who examined Loach's and his coconspirators cell phones. Detective Tankelewicz manually inspected the coconspirator's phone and then memorialized his findings in a report which included an analysis of the coconspirators call log. According to detective Tankelewicz the call logs showed 25 calls between the coconspirator and the phone that was registered to Loach's wife and Tankelewicz also testified that he found a text message from the Loach affiliated phone to the coconspirators phone in the hours before the

18

home invasion. Loach challenged his conviction and managed to obtain cell phone records for his own phone and his alleged coconspirator's phone. The records contradicted the prosecution's argument and characterization of the cell phone evidence that was used to link Loach to his Coconspirators. First cell phone records show that the coconspirator's phone was registered to his wife and the prosecution misrepresented the phone as belonging to coconspirator both when detective Tankelewicz was testified and when he submitted his report. Second cell phone records for Loaches own phone indicated that his phone did not have text capabilities which again contradicted detective Tankelewicz' testimony and report indicating that he found a text between coconspirator and Loach. Roughly a year after the PCRA court vacated his conviction the office dismissed the charges against Loach citing insufficient evidence to be able to prove Loach's guilt beyond a reasonable doubt. Loach filed a civil lawsuit against the city and the detectives involved in his case. In February 2023, the lawsuit was settled for 300,000.

144. During the 1980's and early 1990's, and concurrent with the time of the investigation of this case by the PPD, there was within the Department a pattern, practice, and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments. On three separate occasions in the 1980's courts in the Eastern District of Pennsylvania issued orders enjoining the PPD from engaging in these practices. See Cliett v. City of Philadelphia, C.A. No. 85-1846 (E.D. Pa. 1985) (consent decree arising out of "Operation Cold Turkey," that resulted in the unlawful arrest and detention of 1500 individuals in drug enforcement practices); Spring Garden Neighbors v. City of Philadelphia, 614 F.Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in Spring Garden area in a homicide investigation); Arrington v. City of Philadelphia, C.A. No. 88-2264 (E.D. Pa. 1988) (enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker").

145. Throughout the late 1980's and early 1990's a narcotics squad operating out of the 39th Police District in Philadelphia engaged in widespread unconstitutional practices, including fabrication of evidence, unlawful search and arrest warrants, concealment of evidence, false allegations of criminality, fabricating and planting evidence, coercive and physically abusive interrogations, and theft. This squad engaged in these practices for years and violated the rights of thousands of persons, due to the deliberate indifference of the PPD, including the disregard of credible complaints to IAD and District Attorney, biased internal investigations, and a practice and custom of exonerating officers regardless of evidence of misconduct.

19

146.    This systemic and unconstitutional practice and custom was ended only upon investigation by the FBI and prosecution of the officers by the United States Attorney's Office. As a result of this pattern of police misconduct that was in effect at the time of the investigation of the homicide for which plaintiff was charged, a Court in the Eastern District entered a Consent Decree requiring wide ranging reforms in the Philadelphia Police Department, and in particular providing for specific limitations on the investigative practices and policies of the PPD. see NAACP v. City of Philadelphia, C.A. No. 96-6045.

147.    At the time of the investigation and prosecution of plaintiff in 2011 - 2013 the PPD had a policy practice or custom of detaining arresting and interrogating purported witnesses without legal cause and with the intent of coercing statements from these persons under threat of punishment or other sanctions and or for material benefits these detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel even where the purported witness and or her attorney sought the right to consult.

148.    This practice, as exemplified by the investigations in plaintiff's case and those detailed above, continued for years due to the deliberate indifference of the PPD and City of Philadelphia to this policy, practice, and custom. Finally, in 2014, after further proof of this policy, practice, and custom was provided to the PPD, the District Attorney, and the City, the PPD issued Directive 151 (January 1, 2014), that provided legal standards for the detention and interview of witnesses and the detention and interrogation of suspects by police detectives.

149.    At the time of the investigation and prosecution of plaintiff in 2011 - 2013 the PPD had a policy practice or custom of ensuring that only those statements which conformed to the PPD's incriminating narrative were accepted and recorded. This policy enabled the fabrication of evidence, the concealment of exculpatory information, and the miscarriages of justice that followed. It is clear that the PPD systematically prioritized statements that met their prosecutorial needs over the actual truth, thereby perpetuating wrongful convictions and undermining the integrity of the legal process.

150.    This practice, as exemplified by the investigations into plaintiff's case and those detailed above, continued for years due to the deliberate indifference of the PPD and City of Philadelphia to this policy, practice, and custom.

151.    In summary, at the time of the investigation and prosecution of the plaintiff, the

20

PPD had a practice, policy, and custom of:

a.    Engaging in unlawful interrogation of suspects, using coercion and threats during interrogations, unlawful witness detentions and interrogations, fabricating and planting evidence, fabricating witness and suspect statements, using improper identification procedures, and concealing and/or failing to disclose exculpatory evidence;

b.    Engaging in the selective recording of suspects, victims, and witness statements.

c.    Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct and/or violate generally accepted police practices.

d.    Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers.

e.    Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights during police investigations and prosecutions of criminal suspects and defendants, including unlawful police interrogations, searches, and arrests, coercion of witnesses, improper identification procedures, falsifying and fabricating evidence, and suppressing exculpatory evidence; and

f.    Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging Philadelphia police, including the defendant officers in this case, to violate the rights of citizens such as Mr. Brown.

152.    At the time of the investigation and prosecution of Ra'Sheen Brown, and for many year before and thereafter, the PPD and the City of Philadelphia has been deliberately indifferent to the need to train, supervise, and discipline police officers. The Internal Affairs Division (IAD) of the PPD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

a.    excessive and chronic delays in resolving disciplinary complaints.

b.    a lack of consistent, rational and meaningful disciplinary and remedial actions.

c.    a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct.

21

d.  The PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent.

e.  The PPD discipline, as practiced, was incident-based rather than progressive; thus, repeat violators were not penalized in proportion to the number of violations.

f.  The conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations.

g.  A global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant.

h.  serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions.

i.  lack of an effective early warning system to identify, track, and monitor "problem" officers.

j.  IAD frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct; interviews that were conducted were below acceptable standards of police practice and failed to address key issues; and

k.  IAD failed to acknowledge the disproportionate and extreme use of force used by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

## CAUSES OF ACTION

### COUNT I: 42 U.S.C. 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial Under the Fourteenth Amendment Against All Individual Defendants

153.  Plaintiff incorporates by reference all the foregoing paragraphs.

154.  The individual defendants, acting individually and in concert, and within the scope of their employment with the PPD, deprived plaintiff of his clearly established constitutional right to due process of law and to a fair trial by:

22

**Count A — Fabrication**: The defendant officers fabricated, planted, and/or tampered with evidence including but not limited to search warrants, cell phone records and a document that would have corroborated the plaintiff's claims that he cooperated.

**Count B — Coercion:** The defendant officers engaged in a systematic regime of physical and psychological violence against the civilian witnesses to force them to cooperate against the person (i.e., plaintiff) they deemed responsible whether those inculpatory statements were ultimately true or not; and

**Count C — Deliberate Deception**: The defendant officers deliberately deceived counsel and the court by concealing and/or suppressing relevant and material evidence, including but not limited to a shift log showing that Pirrone was not at work on the day Graham was brought in, a document that corroborated defense cooperation, a document that showed the plaintiff provided the names and numbers ascribed to Graham, and a document that showed Graham's cell phone records were received by detectives.

155. The individual defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to plaintiff's clearly established constitutional rights. No reasonable officer in 2011-2013 would have believed this conduct was lawful.

156. Defendants' acts and omissions, as described above, were the direct and proximate cause of plaintiff's injuries. Defendants knew, or should have known, that their conduct would taint the fairness of the proceedings at which plaintiff would face the possibility of a life sentenced, and the harm he sustained as a direct result.

COUNT 11: 42 U.S.C. § 1983 Civil Rights Conspiracy
Against All Individual Defendants

157. Plaintiff incorporates by reference all of the foregoing paragraphs.

158. The individual defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, to act in concert in order to deprive plaintiff of his clearly established Fourteenth Amendment rights to be free from deprivation of liberty without due process of law, and to a fair trial.

159. In furtherance of the conspiracy, the defendants engaged in and facilitated numerous overt acts, including, but not limited to the following:

23

a.      Fabricating evidence, planting evidence, tampering with evidence, and using coercion and/or threats to obtain incriminating witness statements whether those statements were true or false;

b.      Deliberately deceiving counsel and the court by concealing and/or withholding relevant and material evidence, fabricating evidence, tampering with evidence, and using coercion and/or threats to obtain inculpatory witness statements whether those statements were true or false; and

c.      Failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to believe plaintiff had committed the murder and ignoring evidence that exculpated plaintiff.

160.    Defendants' acts and omissions, as described above, were the direct and proximate cause of plaintiff's injuries. Defendants knew, or should have known, that their conduct would result in plaintiff's denial of due process and a fair trial.

COUNT 111: 42 U.S.C. 1983 Failure to Intervene
Against All Individual Defendants

161.    Plaintiff incorporates by reference all of the foregoing paragraphs.

162.    By their conduct, under color of state law and acting within the scope of their employment with the PPD, the individual defendants had opportunities to intervene on behalf of plaintiff to prevent the deprivation of liberty without due process of law and to ensure his right to a fair trial, but with deliberate indifference failed to do so.

163.    The defendants' failures to intervene violated plaintiff's clearly established constitutional right not to be deprived of liberty without due process of law and a fair trial as guaranteed by the Fourteenth Amendment. No reasonable police officer in 2011-2013 would have believed that failing to intervene to prevent these defendants from coercing and fabricating inculpatory evidence, using coercion and/or direct suggestion to obtain witness statements, tampering with evidence, planting evidence, deliberately deceiving counsel and the court, failing to conduct a constitutionally adequate investigation, and causing Mr. Brown to be subjected to an unfair trial, were lawful.

164.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of plaintiff's injuries. Defendants knew, or should have known, that their conduct would result in the denial of due process and a unfair trial.

24

## COUNT IV: 42 U.S.C. 1983 Municipal Liability Claim
### Against Defendant City of Philadelphia

165.    Plaintiff incorporates by reference all the foregoing paragraphs.

166.    The City of Philadelphia, by and through its final policymakers, had in force and effect during time of plaintiff's arrest and trial, and for many years preceding and following the trial, a policy, practice, or custom of unconstitutional conduct in homicide and other criminal investigations, that included using coercive techniques in interviews and interrogations; fabricating evidence; fabricating and/or coercing incriminating statements from witnesses, suspects, and arrestees by coercion, threats, and suggestion; tampering with evidence; planting evidence; concealing and/or withholding exculpatory evidence; failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to arrest and prosecute; and failing to properly document statements giving by defendants, victims, and witnesses until those statements were in conformity with inculpating a particular person.

    a.   Policymakers for the City of Philadelphia had actual or constructive notice of the above practices, policies, and customs, but repeatedly failed to undertake any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations: withholding exculpatory evidence; fabricating inculpatory evidence; tampering with evidence; planting evidence; fabricating and/or coercing incriminating statements from witnesses, suspects, and arrestees; failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to arrest and prosecute; and failing to properly document statements giving by defendants, victims, and witnesses until those statements were in conformity with inculpating a particular person; and failing to take appropriate remedial and/or disciplinary actions to curb the above misconduct.

    b.   The unconstitutional municipal customs, practices and/or policies described above were the moving force behind plaintiff's trial for murder, and the other injuries and damages set forth in this Complaint.

## COUNT V: DAMAGES
### Against All Defendants

167.    Plaintiff incorporates by reference all the foregoing paragraphs.

168.    The unlawful, intentional, willful, deliberately deceptive, reckless, deliberately indifferent, and/or malicious actions and omissions of all defendants caused plaintiff to be compelled to stand trial facing a life sentence which resulted in pain and suffering, mental anguish, emotional distress, restrictions on personal liberty, loss of freedom, deprivation of familial relationships, economic harms, and other associated damages.

## COUNT VI: PUNITIVE DAMAGES
### Against All Individual Defendants

169.    Plaintiff incorporates by reference all the foregoing paragraphs.

170.    The defendant officers acted willfully, deliberately, maliciously or with reckless disregard of the plaintiff's constitutional rights and punitive damages should therefore be awarded against the individual defendants.

WHEREFORE, Plaintiff Ra'Sheen Brown requests the following relief:

a. Compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

b. Punitive damages to Plaintiff and against all individual Defendants, jointly and severally, in an amount to be determined at trial;

c. Pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims;

d. Any and all other relief to which Plaintiff may be entitled; and

e. A jury trial as to each defendant and as to each count.

/s/ Ra'Sheen J. Brown, Sr.

Ra'Sheen J. Brown, Sr.
614 S. 8th Street, #330
Philadelphia, PA 19147
Email: rjbrownsr20@gmail.com
Phone: (267) 981-8737

26

JS 44 (Rev. 11/15)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS** Ra'Sheen J. Brown

**DEFENDANTS** City of Philadelphia, Ronald Dove, James Pitts, John Harkins, John Koen, George Pierone, Christopher Tankelewicz,

**(b)** County of Residence of First Listed Plaintiff   Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Philadelphia
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

REC'D MAY 1 3 2025

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
42 U.S.C Sections 1983, 1985, 1986 and 1988

Brief description of cause:
Denial of fair trial, due process, and other rights as a result of coercing witnesses.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ $10,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____